**NORFOLK ENERGY, INC.,**
**Plaintiff–Appellant,**

v.

**Donald HODEL, Secretary of the Interior of the United States, et al., Defendants–Appellees.**

No. 88–4392.

United States Court of Appeals, Ninth Circuit.

Argued and Submission Deferred Dec. 4, 1989.

Re–Submitted Dec. 13, 1989.

Decided March 28, 1990.

Mary Scrim, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Mont., for plaintiff-appellant.

Angus E. Crane, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before WALLACE, PREGERSON and NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

The Bureau of Land Management ("BLM") imposed a $250 fine on Norfolk Energy, Inc. ("Norfolk") after the company refused to supply schematic drawings of its natural gas facilities located on nonfederal and non-Indian land within two federally approved gas production units. The Interior Board of Land Appeals ("the IBLA") upheld the fine, ruling that BLM had authority under federal statute and regulations to request the schematic drawings and to impose the fine. The district court held that Norfolk failed to establish that the IBLA decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and granted summary judgment for the government. On appeal, Norfolk contends that the IBLA decision conflicts with controlling statutory authority and erroneously interprets federal regulations, and that regulation of the Tiger Ridge and Bullhook facilities violates the company's constitutional rights. We have jurisdiction over the district court's final order under 28 U.S.C. § 1291. We affirm.

## BACKGROUND

### I. Facts and Procedural History

Norfolk[1] is a Montana corporation that produces natural gas and operates several natural gas production "units." Two of these units—the Tiger Ridge Unit and the Bullhook Unit—contain federal and/or Indian land.[2] These two units were formed under Montana law in 1971, and were approved by the federal government and adopted by the Montana Board of Oil and Gas Conservation in 1972. The agreements that established these units contain the following language:

1. ENABLING ACT AND REGULATIONS. The Mineral Leasing Act of February 25, 1920, as amended, supra, and all valid, pertinent regulations, including operating and unit plan regulations, heretofore issued there-under or valid, pertinent regulations issued thereunder are accepted and made a part of this Agreement *as to Federal [and Indian] lands*, provided such regulations are not inconsistent with the terms of this Agreement.

*Tricentrol United States, Inc.*, 97 I.B.L.A. 387, 388–89 (emphasis added by the IBLA) (footnote omitted).[3]

In 1985, BLM requested by letter that Norfolk supply schematic drawings of natural gas facilities operated by Norfolk within six units containing federal and/or Indian lands, including the Tiger Ridge and Bullhook units. *Tricentrol*, 97 I.B.L.A. at 388. Norfolk supplied drawings of its facilities in all units except the Tiger Ridge and Bullhook units. On September 25, 1985, BLM fined Norfolk $250 for failing to provide schematic drawings of its Tiger Ridge and Bullhook facilities.[4]

Norfolk appealed to the IBLA. It argued that the unit agreements, which state that federal regulations are "accepted and made a part of [the] Agreement as to Federal [and Indian Lands]," implicitly deny BLM authority to request the drawings. "By clear implication," Norfolk argued, "non-federal and non-Indian Lands [in the Tiger Ridge and Bullhook units] would not be subject to ... regulation" under the unit agreements. *See Tricentrol*, 97 I.B.L.A. at 389. The IBLA rejected that argument and upheld the fine. It ruled that "BLM's jurisdiction under the regulations ... extend[s] to private lands included in a unit with Federal and/or Indian lands, and that BLM properly exercised its authority in requesting the schematic diagrams of facilities located on such private lands." *Id.* at 395. The IBLA also held that BLM's assessment of the $250 fine was proper under the applicable regulations. *Id.*

1. Norfolk was formerly known as Tricentrol United States, Inc. and High Crest Oils, Inc.

2. The Tiger Ridge Unit contains 6.87 percent federal land. The Bullhook Unit contains 8.31 percent federal land and 6.03 percent Indian land. *See Tricentrol United States, Inc.*, 97 I.B.L.A. 387, 388 (1987).

3. "Only the Bullhook Unit Agreement includes the bracketed phrase, since the Tiger Ridge Unit contains no Indian lands." *Tricentrol*, 97 I.B.L.A. at 389 n. 2.

4. BLM based its request and the subsequent penalty on site security regulations issued by the U.S. Department of Interior pursuant to the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–1757 (1983). The regulations state in relevant part:

(1) Facility diagrams are required for all facilities which are used in storing oil/condensate produced from, or allocated to, Federal or Indian lands. Facility diagrams shall be filed within 60 days after new measurement facilities are installed or existing facilities are modified or following the inclusion of the facility into a federally supervised unit or communitization agreement....

(3) A site facility diagram shall accurately reflect the actual conditions at the site and shall ... clearly identify the vessels, piping, metering system, and pits, if any, which apply to the handling and disposal of oil, gas and water. The diagram shall indicate which valves shall be sealed and in what position during the production or sales phase. The diagram shall clearly identify the lease on which the facility is located and the site security plan to which it is subject, along with the location of the plan.

43 C.F.R. § 3162.7–5(d) (1988). Under regulations then in effect, BLM could impose an assessment of up to $250 for "failure to comply with a written order or instructions of [an] officer, ... if compliance is not obtained within the time specified." 43 C.F.R. § 3163.3(a) (1984) (current penalty assessment regulations are at 43 C.F.R. 3163.1 (1988)).

Norfolk then filed a complaint in the district court on August 25, 1987, requesting that the district court declare that the onshore oil and gas regulations do not apply to facilities "located on private leases which participate with federal and/or Indian leases under a Unit Agreement such as the Unit Agreements involved in this action," and that retroactive application of the regulations was unconstitutional. The district court was also asked to reverse the IBLA's decision upholding the $250 fine and requiring site facility diagrams for the Tiger Ridge and Bullhook facilities. The district court granted the government's motion for summary judgment and denied Norfolk's cross-motion for summary judgment on September 26, 1988, holding that Norfolk had "failed to establish that the IBLA's decision ... that the regulations found in 43 C.F.R. § 3160 were applicable to the Bullhook and Tiger Ridge Units, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Order and Memorandum of the District Court, Sept. 26, 1988, at 6.

## II. Statutory and Regulatory Framework

### A. Unitization of Gas and Oil Operations.

The Mineral Leasing Act, 30 U.S.C. §§ 181–194, 221–237 (1987), and Montana law, Mont.Code Ann. §§ 82–11–201–216 (1988), provide for "unitization" of oil and gas production operations that draw on common reservoirs. Unitization "permit[s] the entire [oil and gas] field (or a substantial portion of it) to be operated as a single entity, without regard to surface boundary issues." 6 H. Williams & C. Meyers, *Oil & Gas Law* § 901, at 3–4 (Supp.1988). The Bullhook and Tiger Ridge Units are " 'entire reservoir' units, wherein all leases and wells on an entire reservoir are consolidated for the purpose of operating the reservoir as a single producing mechanism." Order and Memorandum of the District Court, Sept. 26, 1988, at 3 (citing *Armstrong v. High Crest Oils, Inc.*, 164 Mont. 187, 520 P.2d 1081, 1085 (1974)).

Under the Mineral Leasing Act, lessees on federal or Indian lands may "unite with each other, or jointly or separately with others, in collectively adopting and operating under a cooperative or unit plan of development or operation ... whenever determined and certified by the Secretary of the Interior to be necessary or advisable in the public interest." 30 U.S.C. § 226(j). The regulations set forth procedures under which the Secretary of the Interior approves unit participation by lessees on federal and Indian lands. *See* 43 C.F.R. § 3180–86 (1988). The Montana Board of Oil and Gas Conservation, on its own motion or on the motion of an interested person, establishes "unit areas." If after holding hearings the Board considers formation of a unit on a particular reservoir necessary, the Board sets forth a "unit operation plan" detailing the nature, purpose, and operations of the unit, and selects a "unit operator." *See* Mont.Code Ann. §§ 82–11–201–216. The plan takes effect upon approval by 80 percent of the interests in the unit area. *Id.* at § 82–11–207.

Unit operation makes possible "greater recovery at less cost ... [because] the field is treated as an entity and wells so located that they can maximize the use of reservoir energy." 6 H. Williams & C. Meyers, *Oil & Gas Law* § 901, at 3–4; *see generally* R. Hemingway, *The Law of Oil & Gas* § 7.13 (discussing the benefits of unitization). Congress authorized participation by lessees of federal and Indian lands in unitization agreements to conserve the natural resources of oil or gas pools, fields, and similar areas. *See* 30 U.S.C. § 226(j). Similarly, the Montana legislature established the state's unit formation process to "prevent or to assist in preventing waste of oil or gas." Mont.Stat.Ann. § 82–11–201.

### B. Management of Federal Oil and Gas Royalties.

The Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–1757 (1983) ("the FOGRMA") authorized the Secretary of the Interior to develop a comprehensive system of royalty management. A principal purpose of the FOGRMA is "to clarify, reaffirm and expand the ... re-

sponsibilities of the Secretary of the Interior in the management of the Federal oil and gas royalty accounting system." H.R. Rep. No. 859, 97th Cong., 2d Sess. at 15, *reprinted in* 1982 U.S.Code Cong. & Admin.News 4268. Congress enacted the FOGRMA to address serious deficiencies in the federal royalty management system which, according to the General Accounting Office, at that time cost the federal government up to $500 million annually. *Id.* at 4269; *see generally* Commission on Fiscal Accountability of the Nation's Energy Resources, *Fiscal Accountability of the Nation's Energy Resources* at 13–33 (1982) (discussing flaws in federal royalty accounting system).

The Department of the Interior has promulgated extensive regulations pursuant to the FOGRMA, under which BLM monitors oil and gas production on federal and Indian lands to ensure adequate royalty payment. *See* 43 C.F.R. § 3160–3165 (1988). These regulations "govern operations associated with the exploration, development and production of oil and gas deposits from leases issued or approved by the United States, restricted Indian land leases and those under the jurisdiction of the Secretary of the Interior by law or administrative arrangement," 43 C.F.R. § 3160.0–1 (1988). The regulations make up a comprehensive inspection, collection, and accounting system.

## STANDARD OF REVIEW

■ We review the district court's grant of summary judgment de novo. *Kruso v. International Tel. & Tel. Corp.,* 872 F.2d 1416, 1421 (9th Cir.1989). We will affirm if, viewing the record in the light most favorable to Norfolk, there is no genuine issue of material fact and the government is entitled to judgment as a matter of law. *Tzung v. State Farm Fire and Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

■ The decision of the administrative agency at issue in this case, however, should not be reversed unless it is arbitrary, capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A); *see Marathon Oil Co. v. United States,* 807

F.2d 759, 765 (9th Cir.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). An agency's interpretation of a statute that the agency is charged with administering is entitled to substantial deference, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–845, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), and an agency's interpretation of its regulations is controlling if not " 'plainly erroneous or inconsistent with the regulation[s].' " *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

## DISCUSSION

In this case we must decide whether the IBLA erred by ruling that BLM had authority to request schematic drawings of Norfolk's facilities on nonfederal and non-Indian lands in the Tiger Ridge and Bullhook units when the Tiger Ridge and Bullhook unit agreements accept federal regulation only of federal and Indian lands. Norfolk contends that the IBLA decision violates the FOGRMA, contradicts regulations in force at the time BLM requested the drawings, and produces unconstitutional results. We disagree, and uphold the IBLA decision.

### I. *The Statute*

■ Norfolk first contends that the IBLA ignored a clear statutory mandate when it upheld BLM regulation of nonfederal and non-Indian lands in the Tiger Ridge and Bullhook units. It bases this argument on section 305 of Public Law 97–451, which enacted the FOGRMA. Section 305 provides:

The provisions of this Act ... shall apply to oil and gas leases issued before, on, or after the date of the enactment of this Act, *except that in the case of a lease issued before such date, no provision of this Act, or any rule or regula-*

*tion prescribed under this Act shall alter the express and specific provisions of such a lease.*

Federal Oil and Gas Royalty Management Act of 1982, Title III, § 305, 96 Stat. 2461 (1983) (codified at 30 U.S.C. §§ 1701–1757) (emphasis added).

Norfolk argues that its agreements with the federal government "specifically exclude application of federal laws and regulations to nonfederal and non-Indian lands within the [Tiger Ridge and Bullhook] Units," because the unit agreements state that "regulations, including operating and unit plan regulations ... are accepted and made a part of this Agreement as to Federal [and Indian] lands." According to Norfolk, the IBLA decision upholding the requirement that Norfolk supply schematic drawings to BLM "runs contrary to an express contractual provision negotiated between Norfolk and the Government," and, therefore, violates section 305.[5]

The critical issue raised by this argument is whether application of the federal regulation in this case "alter[s] the express and specific provisions" of the unit agreements. While that agreement affirmatively *accepts* federal regulation of operations on federal and Indian lands, it is *silent* as to regulation of nonfederal and non-Indian lands. Norfolk argued to the IBLA that by "clear implication" the unit agreements preclude regulation of nonfederal and non-Indian lands in the Tiger Ridge and Bullhook Units. *See Tricentrol,* 97 IBLA at 389. On appeal to this court, Norfolk frames its argument in stronger terms, contending that "the application of regulations promulgated under FOGRMA requiring the submission of site facility diagrams for nonfederal and non-Indian lands alters the express terms of the unit agreements," and that Norfolk and the federal government "clearly contracted that the federal government would not, by regulation, impose itself on the operations involving nonfederal and non-Indian lands."

Application of the oil and gas regulations to Norfolk's Tiger Ridge and Bullhook facilities does not "alter the express and specific provisions" of the unit agreements. Notwithstanding Norfolk's attempts to recharacterize the language of the unit agreements, the agreements do *not* preclude federal regulation of nonfederal, non–Indian lands by "express and specific" terms. In fact, the language of the unit agreements relied on by Norfolk is vague, and is silent on the issue of regulation of private lands. The IBLA decision is not contrary to section 305.

## II.   The Regulations

■ Norfolk next contends that the IBLA's decision contradicted, rather than reasonably interpreted, the applicable oil and gas regulations. BLM requested that Norfolk supply schematic drawings of the facilities on private lands within the Tiger Ridge and Bullhook units in 1985. At that time, onshore oil and gas regulations concerning site security—including schematic drawing requirements—applied to "all operations conducted on or for the benefit of a Federal or Indian oil and gas lease, by, or on behalf of, the lessee." 43 C.F.R. § 3161.1 (1984). The regulations in effect when BLM requested the schematic drawings did not specifically state whether BLM had authority to regulate nonfederal and non–Indian holdings within federally approved oil and gas units. However, a preamble to section 3161.1 of the regulations explained:

One comment [on the proposed rule] suggested that [the regulations] be strictly limited so that they apply only to Federal and Indian leases. The final rulemaking does not adopt the suggestion.... The principle of unitization, or other pooling, is that operations on any committed lease are deemed to be on or for the benefit of any other committed lease. Since all committed leases within a communitized area or unit participating

---

**5.** Norfolk's argument assumes that the Tiger Ridge and Bullhook Unit Agreements constitute "leases" under section 305. The government makes no argument to the contrary, and the definition of "lease" given in the statute and regulations supports Norfolk's position. *See* 30 U.S.C. § 1702(5); 43 C.F.R. 3160.0–5(f) (1988). We, therefore, treat the unit agreements as "leases" under section 305.

area share in the total production from the unitized tract or participating area regardless of the ownership of the mineral estate where the wells are located, [BLM] must have some limited authority to obtain needed data and to inspect [nonfederal] and non-Indian sites to assure that the Federal and Indian interests are protected. This limited authority is spelled out in the formal agreement, i.e., unit, communitization, or gas storage. If the agreement fails to provide such limited authority to the Bureau, ... these regulations do not apply to operations on private or State lands.

49 Fed.Reg. 37,357 (1984).

Norfolk argues that BLM did not have authority to regulate nonfederal and non-Indian lands in the Tiger Ridge and Bullhook units when it requested the schematic drawings in 1985 because the unit agreements for those areas did not expressly provide BLM with that authority. According to Norfolk, the preamble to 43 C.F.R. § 3161.1, in effect in 1985, required express authorization of federal regulation in the unit agreements.[6]

The IBLA acknowledged that Norfolk "derive[d] support" from the preamble to section 3161.1, and that "[t]he Bullhook and Tiger Ridge Unit agreements do not expressly provide BLM with the limited authority to obtain data and to inspect wells on private lands in those units." 97 I.B.L.A. at 390–391. The IBLA, however, looked beyond the language of the preamble and the unit agreements, and "turn[ed] to the regulations to determine whether [the regulations] provide such authority," 97 I.B.L.A. at 391. After a thorough review of the regulations and the statute, the IBLA concluded that the regulations in ef-

fect in 1985 gave BLM authority to request the drawings from Norfolk. 97 I.B.L.A. at 394–395.

The regulations as a whole support the IBLA's conclusion that BLM had authority to acquire schematic drawings of facilities in the Tiger Ridge and Bullhook units for purposes of monitoring allocation and participation under the unit agreements. At the time BLM requested the drawings, the site security regulations applied to all operations "conducted on or for the benefit of" federal or Indian oil and gas leases. 43 C.F.R. § 3161.1 (1984). The same preamble on which Norfolk rests its argument stated that "operations on any ... lease [committed to a unit agreement] are deemed to be on or for the benefit of any other committed lease." 49 Fed.Reg. 37,-357. The preamble further stated that BLM "must have some limited authority to obtain needed data and to inspect non–Federal and non–Indian sites to assure that the Federal and Indian interests are protected." *Id.* In addition, the regulations clearly gave BLM authority to *inspect* nonfederal and non–Indian lease sites in federally approved oil and gas units. 43 C.F.R. § 3161.3(a) (1988). As the IBLA reasoned,

[it] would be anomalous ... to conclude that BLM [had] the authority pursuant to 43 [C.F.R. §] 3161.3 to inspect private lands subject to a formal unit agreement to ensure compliance with the ... regulations, but that BLM lack[ed] the authority to acquire schematic diagrams of wells on those same lands for purposes of monitoring allocation and participation under the unit agreements.

97 I.B.L.A. at 393.

■ We defer to the IBLA's interpretation of the regulations unless it is plainly

6. There is no question that BLM now has authority to regulate nonfederal and non-Indian lands in federally approved oil and gas units, regardless of the language of the unit agreements. On February 20, 1987, the Department of the Interior amended the regulations to clearly state that nonfederal and non-Indian lands in federally approved oil and gas units are subject to site security and other regulations. The regulations now state:
    (a) All operations conducted on a Federal or Indian oil and gas lease by the operator are subject to the regulations in this part.

(b) Regulations in this part relating to site security, measurement, reporting of production and operations, and assessments or penalties for noncompliance with such requirements are applicable to all wells and facilities on State or privately-owned mineral lands committed to a unit or communitization agreement which affects Federal or Indian interests, *notwithstanding any provision of a unit or communitization agreement to the contrary.*
43 C.F.R. § 3161.1 (1988) (emphasis added).

erroneous or inconsistent with the regulations. *Marathon Oil Co. v. United States,* 807 F.2d at 765; *Udall v. Tallman,* 380 U.S. at 16–17, 85 S.Ct. at 801. While a single sentence in the preamble apparently limited BLM authority to regulate Norfolk's Tiger Ridge and Bullhook facilities, the overall regulatory and statutory scheme in place when BLM requested the schematic drawings strongly supports the IBLA's decision. In discerning the meaning of regulatory language, "our task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme, and not to give force to one phrase in isolation." *Campesinos Unidos v. United States Dept. of Labor,* 803 F.2d 1063, 1069 (9th Cir.1986). We hold that the IBLA reasonably interpreted the regulations.

### III. Norfolk's Constitutional Arguments

■ Finally, Norfolk makes two constitutional challenges to federal regulation of its Tiger Ridge and Bullhook facilities. First, citing *Lynch v. U.S.,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), Norfolk contends that the unit agreements were contracts; that those contracts were property within the meaning of the Fifth Amendment; that the federal government, through statute and regulation, annulled those contracts; and that this act constituted a "taking" of Norfolk's property without just compensation in violation of Norfolk's fifth amendment due process rights.

This argument is meritless. It is premised on Norfolk's assertion that "in [the] unit agreements the parties clearly contracted that the federal government would not, by regulation, impose itself on the operations involving nonfederal and non–Indian lands." As discussed earlier, there is no clear contract to that effect. Further, *Lynch v. U.S.* involved an act of Congress that completely "abrogated outstanding contracts and relieved the United States from all liability." 292 U.S. at 579, 54 S.Ct. at 843. The "contracts" in this case are the unit agreements, and the statute and regulations that Norfolk challenges did not annul the unit agreements.

Second, Norfolk argues that application of the statute and regulations to nonfederal and non–Indian lands in the Tiger Ridge and Bullhook units constitutes unconstitutional retroactive legislation because the unit agreements were signed well before enactment of the FOGRMA.

■ This argument, too, is meritless. Section 305 clearly states that its provisions, and regulations prescribed under the act, "shall apply to oil and gas leases issued *before, on, or after the date of the enactment of [the] Act.*" 96 Stat. 2461 (emphasis added). Retroactive application of statutes and regulations, if expressly authorized by Congress, is valid if the application is a rational means of serving a legitimate legislative purpose. *Usery v. Turner Elkhorn Mining,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976); *cf. Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (requiring express congressional statement of retroactive application of regulations). The retroactive application of the site security, measurement and production reporting measures is authorized by section 305, and rationally serves the legitimate purpose of conserving natural resources and saving government money. The retroactive application of the statute and regulations is, therefore, vaild.

### CONCLUSION

The district court correctly concluded that the IBLA's decision was not unreasonable or irrational. The judgment of the district court is AFFIRMED.