141 T.C. No. 18

UNITED STATES TAX COURT

LARRY E. AUSTIN AND BELINDA AUSTIN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF ARTHUR E. KECHIJIAN, DECEASED, SUSAN P. KECHIJIAN
AND SCOTT E. HOEHN, CO-EXECUTORS, AND SUSAN P. KECHIJIAN,
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8966-10, 8967-10.         Filed December 16, 2013.

Ps exchanged property for ostensibly restricted stock of a newly formed S corporation (S). The governing agreements provided that Ps, upon termination of employment, would receive less than the full fair market value of their S shares only if they were terminated "for cause" during the initial term of the employment agreement. Section 7(B) of the employment agreement defined termination "for cause" to include termination upon "[f]ailure or refusal by Employee * * * to cure by faithfully and diligently performing the usual and customary duties of his employment." Section 1.83-3(c)(2), Income Tax Regs., provides that a requirement that stock be forfeited "if the employee is discharged for cause or for committing a crime will not be considered to result in a substantial risk of forfeiture."

1. <u>Held</u>:  The term "discharged for cause," as used in section 1.83-3(c)(2), does not necessarily have the same meaning the parties have given that term in their private agreements but refers to termination for serious misconduct which, like criminal misconduct, is highly unlikely to occur.

2. <u>Held</u>, <u>further</u>, the risk that Ps would receive less than full fair market value upon forfeiture of their stock if they failed faithfully and diligently to perform the usual and customary duties of their employment during the prescribed period constituted an earnout restriction that could create a "substantial risk of forfeiture" if there existed a sufficient likelihood that the restriction would actually be enforced.

<u>Lynn Forrest Chandler</u>, <u>Jonathan P. Heyl</u>, and <u>Tanya N. Oesterreich</u>, for petitioners.

<u>Patricia Pierce Davis</u>, <u>Nina E. Choi</u>, and <u>Mark L. Hulse</u>, for respondent.

OPINION

LAUBER, <u>Judge</u>:  These consolidated cases are before this Court on respondent's motion for partial summary judgment and petitioner's motion for summary judgment both filed under Rule 121.[1]  The sole issue for decision is

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) in effect for the tax years 2000, 2001, 2002, 2003 and 2004, and all Rule references are to the Tax Court Rules of Practice and Procedure.

whether stock petitioners received in December 1998, which was labeled "restricted stock," was subject to a substantial risk of forfeiture when issued to them or rather was "substantially vested" within the meaning of section 83 and section 1.83-1(a)(1), Income Tax Regs. Under the governing employment agreements, petitioners would forfeit a substantial amount of the value of their stock upon the occurrence of various events, enumerated in a paragraph that addressed termination "for cause." Under section 1.83-3(c)(2), Income Tax Regs., a requirement that stock be forfeited "if the employee is discharged for cause or for committing a crime will not be considered to result in a substantial risk of forfeiture." Disposition of the pending motions requires us to determine the scope of the phrase "for cause" as used in section 1.83-3(c)(2), Income Tax Regs., and the proper application of that regulation to the agreements involved here.

## Background

The following facts are not in dispute. Larry Austin and Arthur Kechijian (petitioners) resided in North Carolina when they filed petitions.[2] Belinda Austin and Susan Kechijian are parties to these cases solely by virtue of having filed joint Federal income tax returns with their husbands for the tax years at issue.

---

[2]Petitioner Arthur E. Kechijian died while the summary judgment motions were pending. On October 24, 2013, we substituted his estate as a party petitioner. His estate is being probated in North Carolina.

Petitioners worked together for more than 15 years in the "distressed debt loan portfolio business." Before 1998 petitioners were the original shareholders and members of a group of related companies called "the UMLIC Entities." In December 1998 petitioners formed, and elected subchapter S status for, UMLIC Consolidated, Inc., a North Carolina corporation (UMLIC S-Corp.). In a section 351 transaction, each petitioner transferred his unrestricted ownership interest in the UMLIC Entities to UMLIC S-Corp. in exchange for 47,500 shares of its common stock. Concurrently, UMLIC S-Corp. issued 5,000 shares of its common stock, in exchange for a note, to an employee stock ownership plan (ESOP) for its employees, including petitioners. Thus, as of December 7, 1998, each petitioner owned 47.5% of UMLIC S-Corp., and the ESOP owned 5%. At all relevant times, petitioners were the only directors on the UMLIC S-Corp. board of directors. Petitioners, along with the company's assistant controller, were the initial trustees of the ESOP.

Petitioner Kechijian was employed as the president of UMLIC S-Corp. He had responsibility for general operations and for servicing loan portfolios, including workout strategies, loan sales, foreclosures, and loan modifications. Petitioner Austin was employed as senior executive vice president of UMLIC S-Corp. He had responsibility for loan portfolio acquisitions, including due diligence involved

in the evaluation of loan portfolios, foreclosure gain/loss analysis, expected cashflows, bidding strategies, and investor relationships.

As part of the section 351 exchange, each petitioner executed with UMLIC S-Corp. substantially identical agreements denominated "Restricted Stock Agreement" (RSA) and "Employment Agreement." These agreements were explicitly linked. Section 12 of the employment agreement stated that the employee's ownership of UMLIC S-Corp. shares "shall be governed by * * * [the RSA] entered into simultaneously * * * [and] incorporated herein by reference."

The stated purpose of these agreements was to incentivize petitioners to exchange their UMLIC interests for UMLIC S-Corp. stock and require them to perform future services in order to secure full rights in this stock. The RSA stated the company's intention "to induce * * * [each petitioner's] continued employment on behalf of * * * [UMLIC S-Corp.] * * * by providing certain financial incentives under this Agreement." Conversely, each petitioner agreed that, in consideration of UMLIC S-Corp.'s issuance of shares to him, he was "willing to perform future services on behalf of * * * [UMLIC S-Corp.] under the terms of the Employment Agreement."

The shares issued to petitioners bore the following legend: "The shares represented by this certificate, and the transfer hereof, are subject to the terms of

* * * [the RSA]." The RSA permitted limited transfer of the shares to or for the benefit of family members. However, transfer was permitted only if the transferee agreed to be bound by the RSA and hence by any restrictions on full enjoyment of the stock to which the RSA subjected petitioners.

Section 4 of the employment agreement provided that "[t]he initial term of this Agreement shall commence on December 7, 1998 * * * and shall continue until January 1, 2004." Section 1 of the Agreement, captioned "Employment," provided:

> During the term of this Agreement * * * [employee] will devote all of his efforts to the performance of his duties as * * * [an officer of UMLIC S-Corp.] and any other duties and responsibilities the Board of Directors * * * may assign to him from time to time. Employee agrees to perform such duties and responsibilities faithfully, diligently and in a timely manner and to abide by all * * * [UMLIC S-Corp.] policies relating to its employees generally.

Section 7 of the employment agreement, captioned "Termination," provided that "[t]his Agreement may be terminated by * * * [UMLIC S-Corp.] at any time for cause." The Agreement makes no provision for termination by the employee, and it makes no provision for termination by the employer on grounds other than "for cause." For purposes of the Agreement, "cause" was defined to "include, without limitation," the following three categories of employee action:

A. Dishonesty, fraud, embezzlement, alcohol or substance abuse, gross negligence or other similar conduct on the part of the Employee. Upon termination of this Agreement, Employee shall be entitled to receive compensation through the date of termination.

B. Failure or refusal by Employee, after 15 days written notice to Employee, to cure by faithfully and diligently performing the usual and customary duties of his employment and adhere to the provisions of this Agreement.

C. Failure or refusal by Employee, after 15 days written notice to Employee, to cure by complying with the reasonable policies, standards and regulations applicable to employees which * * * [UMLIC S-Corp.] may establish from time to time.

Section 4 of the RSA, captioned "Termination of Employment," governed the consequences "[i]n the event of termination, voluntary or otherwise," of the employee's employment with UMLIC S-Corp. Section 4 addressed two types of termination: "termination without cause" and "termination with cause." If the employee's employment was terminated "without cause, as defined in Section 7 of the Employment Agreement,"[3] he would be deemed by RSA section 4(b) to have offered to sell all of his stock to the company pursuant to RSA section 5(b). The latter provided that, if employment terminated after December 31, 2003--that is, following the end of the initial term of the employment agreement--and the employee was not in material breach of either agreement, he would receive 100%

---

[3]In fact, section 7 of the employment agreement does not define termination "without cause," and those words do not appear in that section.

of the fair market value of his stock, as determined by formula. Regardless of his actual termination date, in other words, an employee discharged "without cause" would be treated as if he had terminated employment after December 31, 2003, and he would receive the full value of his shares.

If the employee's employment was terminated by UMLIC S-Corp. "with cause, as defined in Section 7 of the Employment Agreement," the employee would likewise be deemed to have offered to sell all of his stock to the company under RSA sec. 4(a). However, the purchase price would then depend on the date of the termination. If the employee was terminated for cause after December 31, 2003, he would receive 100% of the fair market value of his stock under RSA section 5(b). If the employee was terminated for cause before January 1, 2004, the purchase price would be governed by RSA section 5(a). It provided that, if employment terminated before January 1, 2004--that is, during the initial term of the employment agreement--the employee would receive at most 50% of the fair market value of his stock, with the possibility of receiving nothing, as determined by formula.

For purposes of filing their individual income tax returns for 2000-2003, petitioners took the position that their UMLIC S-Corp. stock was subject to a "substantial risk of forfeiture" and was thus "substantially nonvested" within the

meaning of section 1.83-3(b), Income Tax Regs.  Section 1.1361-1(b)(3), Income

Tax Regs., generally provides that, for purposes of subchapter S, "stock that is

issued in connection with the performance of services * * * and that is

substantially nonvested (within the meaning of § 1.83-3(b)) is not treated as

outstanding stock of the corporation, and the holder of that stock is not treated as a

shareholder solely by reason of holding the stock."[4]  Petitioners thus took the

position that 100% of the outstanding stock of UMLIC S-Corp. was owned by the

ESOP during 2000-2003 and that 100% of the company's income was allocable to

it.  Accordingly, neither petitioner reported any income or other flowthrough items

from UMLIC S-Corp. on his individual income tax return for 2000-2003.  And

because the ESOP was a tax-exempt entity, it likewise reported no taxable income

from UMLIC S-Corp. during 2000-2003.

The Internal Revenue Service (IRS or respondent) issued to petitioners

timely notices of deficiency that challenged, on a variety of grounds, the tax

structure that petitioners and UMLIC S-Corp. had implemented.  In this Opinion,

we address only one of the theories the IRS has advanced--namely, that peti-

---

[4]A holder of restricted S corporation stock may elect to be treated as a
shareholder, sec. 1.1361-1(b)(3), Income Tax Regs., but neither petitioner made
such an election.

tioners' stock when issued to them was "substantially vested" by virtue of section 1.83-3(c)(2), Income Tax Regs.

## Discussion

### I.    Summary Judgment Standard

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials.  See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001).  Either party may move for summary judgment upon all or any part of the legal issues in controversy.  Rule 121(a).  A motion for summary judgment or partial summary judgment will be granted only if it is shown that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law.  See Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).  The moving party bears the burden of proving that there is no genuine dispute as to any material fact, and the Court views all factual materials and inferences in the light most favorable to the nonmoving party.  Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).

The parties agree that there are no disputes of material fact affecting the question addressed in this Opinion--namely, whether section 1.83-3(c)(2), Income Tax Regs., precludes the agreements at issue from giving rise to a "substantial risk of forfeiture."  Our disposition of this question turns entirely on legal determina-

tions and the interpretation of the governing agreements. We accordingly conclude that we may decide this question summarily.

II.    Status of Petitioners' Stock Under Section 83

The RSA provides that each petitioner, upon termination of employment, will be deemed to have offered to sell his stock to UMLIC S-Corp. at the "purchase price" specified in section 5. Section 5(b), wherever it applies, specifies that the employee will receive 100% of the fair market value of his stock, determined by formula. Section 1.83-3(c)(1), Income Tax Regs., states that "[p]roperty is not transferred subject to a substantial risk of forfeiture to the extent that the employer is required to pay the fair market value * * * to the employee upon the return of such property." The parties accordingly agree that section 5(b) cannot create a substantial risk of forfeiture.

That being so, the only provision of the RSA that could create a substantial risk of forfeiture is section 5(a), under which the employee will receive at most 50% of the fair market value of his stock. Section 5(a) comes into play upon "termination of * * * employment." This subject is governed, apparently comprehensively, by section 4 of the RSA, captioned "Termination of Employment," which applies "[i]n the event of termination, voluntary or otherwise." The only situation in which section 4 triggers the 50% discount mandated by section 5(a) is

a termination "with cause" occurring before January 1, 2004. Under the regulations, a requirement that stock be forfeited "if the employee is discharged for cause * * * will not be considered to result in a substantial risk of forfeiture." Sec. 1.83-3(c)(2), Income Tax Regs. Respondent accordingly concludes that no provision of the RSA gives rise to a substantial risk of forfeiture.

Petitioners contend that the scope of "for cause," as used in section 1.83-3(c)(2), is not necessarily identical to the scope the parties have given that phrase in their agreements. Section 7 of the employment agreement broadly defines three categories of employee action justifying "termination with cause." Petitioners agree that discharge for activity specified in section 7(A)--e.g., for "[d]ishonesty, fraud, embezzlement, alcohol or substance abuse"--is reasonably characterized as a "discharge for cause" within the meaning of the regulation. On the other hand, petitioners contend that termination for activity specified in section 7(B)--i.e., for refusal to perform faithfully "the usual and customary duties of [the employee's] employment"--should not be deemed a "discharge for cause" under section 1.83-3(c)(2). Rather, according to petitioners, section 7(B) is the mechanism the parties have adopted, clumsily perhaps, to enforce the central requirement of the RSA-- that petitioners continue their employment with UMLIC S-Corp. for the four-year term of the employment agreement in order to secure the full value of their stock.

Such a requirement, petitioners contend, necessarily creates a "substantial risk of forfeiture" under the statute and its implementing regulations.

## A.    The Statute and the Regulations

Section 83(a) applies where, as concededly occurred here, property is transferred to a taxpayer "in connection with the performance of services." Upon such a transfer, the excess of the fair market value of the property over the amount (if any) paid for the property shall be included in the taxpayer's gross income in the first taxable year in which the taxpayer's rights in the property "are not subject to a substantial risk of forfeiture." Sec. 83(a). The statute thus permits a taxpayer to defer recognition of any gain until his rights in the restricted property become "substantially vested." Sec. 1.83-1(a)(1), Income Tax Regs.; see Storm v. United States, 641 F.3d 1051, 1056 (9th Cir. 2011).[5]

Section 83(c) provides that "[t]he rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such

---

[5]Because petitioners received their UMLIC-S Corp. shares in a section 351 exchange, they were relieved of any obligation to recognize gain upon receipt of the shares. The relevance of determining whether the shares were "substantially vested" upon receipt is that this determination controls whether petitioners' shares are treated during 2000-2003 as "outstanding stock of the corporation," sec. 1.1361.1(b)(3), Income Tax Regs., for purposes of allocating UMLIC-S Corp. income to petitioners.

property are conditioned upon the future performance of substantial services by

any individual." The regulations echo the statutory definition:

> For purposes of section 83 and the regulations thereunder, whether a risk of forfeiture is substantial or not depends upon the facts and circumstances. A substantial risk of forfeiture exists where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person * * *

Sec. 1.83-3(c)(1), Income Tax Regs.

The requirement that an employee perform future services as a condition of

obtaining full enjoyment of restricted property is sometimes called an "earnout"

restriction. See Campbell v. Commissioner, T.C. Memo. 1990-162, 59 T.C.M.

(CCH) 236, 251, aff'd in part, rev'd in part, 943 F.2d 815 (8th Cir. 1991).

Because of the real possibility that this condition may not be fulfilled, an earnout

restriction will normally create a "substantial risk of forfeiture" that postpones

taxation until the restriction lapses. The regulations provide a clear example of an

earnout restriction:

> On November 1, 1971, corporation X transfers in connection with the performance of services to E, an employee, 100 shares of corporation X stock for $90 per share. Under the terms of the transfer, E will be subject to a binding commitment to resell the stock to corporation X at $90 per share if he leaves the employment of corporation X for any reason prior to the expiration of a 2-year period from the date of such transfer. Since E must perform substantial services for corporation X and will not be paid more than $90 for the stock, regardless of its

value, if he fails to perform such services during such 2-year period, E's rights in the stock are subject to a substantial risk of forfeiture during such period.

Sec. 1.83-3(c)(4), Example (1), Income Tax Regs.

Section 1.83-3(c)(2) of the regulations, the focus of the present controversy, provides several illustrations of substantial risks of forfeiture. It provides in pertinent part:

> Where an employee receives property from an employer subject to a requirement that it be returned if the total earnings of the employer do not increase, such property is subject to a substantial risk of forfeiture. On the other hand, requirements that the property be returned to the employer if the employee is discharged for cause or for committing a crime will not be considered to result in a substantial risk of forfeiture. * * *

Read in isolation, the term "for cause" is susceptible to a broad construction. In the employment law context, "for cause" expresses "a common standard governing the removal of a civil servant or an employee under contract." Black's Law Dictionary 717 (9th ed. 2009). Generally, "[a]n employer has cause for early termination of an agreement for a definite term of employment if the employee has engaged in misconduct, other malfeasance, or other material breach of the agreement, such as persistent neglect of duties, gross negligence, or failure to perform the duties of the position due to a permanent disability." Restatement, Employment 3d, Tentative Draft No. 2, sec. 2.04 (2009). According to the

Restatement, the parties to an employment agreement are free to define the term "for cause" as they believe appropriate to the particular employment setting. Id. The employment law definition of "for cause" can thus cover termination for a wide range of reasons.

The history of a regulation may be helpful in resolving ambiguities in it. See Wallace v. Commissioner, 128 T.C. 132 (2007); Anderson v. Commissioner, 123 T.C. 219, 233 (2004), aff'd, 137 Fed. Appx. 373 (1st Cir. 2005). The Department of the Treasury issued proposed regulations under section 83 in 1971. 36 Fed. Reg. 10787 (June 3, 1971). Section 1.83-3(c), Proposed Income Tax Regs., 36 Fed. Reg. 10790 (June 3, 1971), did not contain the phrase "discharged for cause." Rather, the proposed regulation read in pertinent part: "On the other hand, a requirement that the property be returned to the employer if the employee commits a crime will not be considered to result in a substantial risk of forfeiture." Sec. 1.83-3(c)(1), Proposed Income Tax Regs., supra.

When issuing these regulations in proposed form, the Secretary stated that "[p]rior to the final adoption of such regulations, consideration will be given to any comments or suggestions pertaining thereto." 36 Fed. Reg. 10787. The IRS received 374 pages of public comments, several of which bear on the question here. Comments submitted by the New York State Bar Association, received by

the IRS on January 10, 1972, suggested that "the Regulations should not attempt to create presumptions or draw lines, except in the clearest situations (such as forfeiture conditioned only on committing a crime), because to do so is to make a rule of law where none was authorized by Congress." Comments submitted by Cravath, Swaine & Moore, received by the IRS on July 8, 1971, suggested that the exception for "committing a crime" was sound because "the risk of forfeiture rests upon a single possibility which is very unlikely to happen."

After the public comments were received, but before any final regulations were issued, this Court decided two cases that addressed the meaning of "substantial risk of forfeiture" under section 83. In Ludden v. Commissioner, 68 T.C. 826 (1977), aff'd, 620 F.2d 700 (9th Cir. 1980), we were required to determine the tax consequences when a corporation contributed funds to trusts that failed to qualify under section 401(a). As a collateral matter, we had to determine whether property was subject to a substantial risk of forfeiture under section 83. See id. at 835. The terms of both trusts provided that "[i]f a participating employee has been discharged by the Company for cause, such as any intentional act of proven dishonesty or any other intentional act which would injure the Company," the employee would forfeit the entire amount allocated to him. Id. at 836. We held that "the probability that either of the petitioners would be

discharged for cause from their wholly owned corporation, thereby forfeiting benefits * * *, is too remote to constitute a substantial risk of forfeiture." Ibid.

In Burnetta v. Commissioner, 68 T.C. 387 (1977), we determined that a corporation's pension plan did not qualify under section 401(a) and again had to decide whether the employer's contributions to that plan were includable in the employee's gross income under section 83. The plan provided that the property would be forfeited if the employee was "discharged for theft of company property or embezzlement." Id. at 390, 403. We held that the property was not subject to a substantial risk of forfeiture because the possibility that an employee would be discharged for theft or embezzlement "is too remote to present any substantial risk that the amounts contributed on his behalf will be forfeited." Id. at 405. We noted that the Department of the Treasury had issued proposed regulations under section 83 and stated our belief that our holding was consistent with those regulations. Id. (citing sec. 1.83-3(c)(1), Proposed Income Tax Regs., supra).

The following year, the Department of the Treasury issued the section 83 regulations in final form. T.D. 7554, 1978-2 C.B. 71. The final regulations added the phrase "discharged for cause" to what is now section 1.83-3(c)(2), Income Tax Regs., modifying the sentence in question to read as it currently does: "On the other hand, requirements that the property be returned to the employer if the

employee is discharged for cause or for committing a crime will not be considered to result in a substantial risk of forfeiture." T.D. 7554, 1978-2 C.B. at 78.

When issuing the final regulations, the Department of the Treasury explained the principal changes it had made to the proposed regulations. T.D. 7554, 1978-2 C.B. at 72-73. The insertion of "discharged for cause" into section 1.83-3(c)(2), Income Tax Regs., was not among the changes so discussed. "In addition to the changes already mentioned," the Secretary stated: "[S]everal changes of less significance were made in response to public comments." T.D. 7554, 1978-2 C.B. at 73. The insertion of "discharged for cause" into section 1.83-3(c)(2) was evidently regarded as one of these "less significant" changes.

B.     Discharge "for Cause or for Committing a Crime"

Because the term "for cause" as used in section 1.83-3(c)(2) is not defined in the statute, the regulations, or the legislative history, we employ the standard tools of construction to discern its scope. Regulations are interpreted in the same manner as statutes. See Black & Decker Corp. v. Commissioner, 986 F.2d 60, 65 (4th Cir. 1993), aff'g T.C. Memo. 1991-557. The starting point is the language itself. Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330 (1978). In determining "the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a

whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988); Norfolk Energy, Inc. v. Hodel, 898 F.2d 1435, 1442 (9th Cir. 1990). When a statute is ambiguous, the court must find the interpretation that "can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." NLRB v. Lion Oil Co., 352 U.S. 282, 297 (1957). "We interpret * * * regulations in toto rather than phrase by phrase." Microsoft Corp. v. Commissioner, 115 T.C. 228, 248-249 (2000) (citing Norfolk Energy, Inc., 898 F.2d at 1442). In the end, a regulation will be interpreted to avoid conflict with a statute. See Phillips Petroleum Co. v. Commissioner, 97 T.C. 30, 35 (1991), aff'd without published opinion, 70 F.3d 1282 (10th Cir. 1995).

The text and evolution of section 1.83-3(c)(2) indicate that the term "discharged for cause," as used therein, does not necessarily have the same scope that parties to a particular contract may have given this term in their negotiations. Rather, as used in the regulation, "discharged for cause" refers to termination for serious misconduct that is roughly comparable--in its severity and in the unlikelihood of its occurrence--to criminal misconduct. The 1971 proposed regulations mentioned discharge "for committing a crime" as the only illustration of an employment-related contingency that failed, as a matter of law, to create a

"substantial risk of forfeiture."  Whether a risk of forfeiture is "substantial" gene-

rally "depends upon the facts and circumstances."  Sec. 1.83-3(c)(1), Income Tax

Regs.  Despite this general rule, commenters on the proposed regulations agreed

that the proposed exception for "committing a crime" was reasonable, since this

limited per se rule comprised a narrow, well-defined category of event that was

very unlikely to occur.

We may never know for certain what prompted the Department of the

Treasury, in the 1978 final regulations, to revise this exception to read "discharged

for cause or for committing a crime."  However, a fair inference is that this

revision was implemented to codify the results in Ludden and Burnetta, both of

which were decided the previous year.  In Ludden, we held that a "substantial risk

of forfeiture" did not exist where the employment-related contingency was

"discharge[] * * * for cause, such as any intentional act of proven dishonesty or

any other intentional act which would injure the Company."  68 T.C. at 836.  In

Burnetta, we held that a "substantial risk of forfeiture" did not exist where the

employment-related contingency was "discharge[] for theft of company property

or embezzlement."  In both cases, we viewed the contingency in question as "too

remote" to create a "substantial risk of forfeiture."  Ludden, 68 T.C. at 836;

Burnetta, 68 T.C. at 405.

This history of section 1.83-3(c)(2), Income Tax Regs., strongly suggests that discharge "for cause," like discharge "for committing a crime," refers to a narrow and serious form of employee misconduct that is very unlikely to occur and is thus properly regarded as too remote--as a matter of law--to create a "substantial risk of forfeiture." The fact that the Department of the Treasury did not view the insertion of "discharged for cause" into the final regulations as a change of significance supports this interpretation. And respondent in his posthearing memorandum agrees with this construction:

> It is respondent's position that the phrase "for cause or for committing a crime" was intended to capture risks that are too remote to be considered a substantial risk of forfeiture. Respondent further contends that the addition of the "for cause" provision was intended to clarify that contingencies resulting in an involuntary termination that are too remote to be considered substantial risks go beyond terminations for committing a crime, and include other conduct that results in a termination, but that is very unlikely to occur.

In short, it seems clear that the term "for cause," as used in section 1.83-3(c)(2), does not necessarily have the same meaning as, and may have a narrower meaning than, the terminology employed by particular parties during private negotiations.[6]

---

[6]The canon of construction "noscitur a sociis"--a Latin phrase meaning "it is known by its associates"--supports the construction set forth in the text. This canon of construction "hold[s] that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Black's Law

(continued...)

C.    Application of the Regulation to the Agreements

Section 14 of the employment agreement provides that it "shall be construed in accordance with and governed by the internal law * * * of the State of North Carolina." In interpreting a contract under North Carolina law, the intention of the parties generally controls. Jones v. Palace Realty Co., 37 S.E.2d 906, 907 (N.C.

---

[6](...continued)
Dictionary 1160-1161 (9th ed. 2009). While this canon does not set forth an inescapable rule, it is often wisely applied to avoid giving unintended breadth to a word susceptible to multiple meanings. See James v. United States, 550 U.S. 192, 222 (2007) ("[The] various possible meanings a word should be given must be determined in a manner that makes it 'fit' with the words with which it is closely associated."); Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961) ("noscitur a sociis" is a commonsense cannon); Wallace v. Commissioner, 128 T.C. 132, 141 (2007) ("[T]he meaning of an unclear word or phrase should be determined by the words immediately surrounding it."). For example, in G.D. Searle & Co., the Court interpreted the word "discovery" as used in section 456(a)(2)(B) of the Internal Revenue Code of 1939, which imposed tax on "income resulting from exploration, discovery, or prospecting." Whereas "discovery" is a broad term that in other contexts can include geographical and scientific discoveries, the Court held that its association with "exploration" and "prospecting" suggested that the term, as used in this statute, had the narrower meaning of "discovery of mineral resources." Id. at 307. While "noscitur a sociis" is most commonly applied to lists of three or more terms, it may apply "when two or more words are grouped together." 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction, sec. 47:16, at 347 (7th ed. 2007). Here, the term "for cause" is susceptible to a wide variety of meanings under private contracts. Applying the "noscitur a sociis" canon, we can surmise that the Department of the Treasury, by associating the phrase "for cause" with "for committing a crime," intended "discharge for cause" in section 1.83-3(c)(2), Income Tax Regs., to have a narrower meaning and to denote termination for serious misconduct that is roughly comparable to criminal misconduct.

1946) ("The heart of a contract is the intention of the parties."); <u>Bueltel v. Lumber Mut. Ins. Co.</u>, 518 S.E.2d 205, 209 (N.C. Ct. App. 1999) ("The court is to interpret a contract according to the intent of the parties to the contract, unless such intent is contrary to law."). The intention of the parties "is to be gathered from the entire instrument, viewing it from its four corners." <u>Jones</u>, 37 S.E.2d at 907.

We review the employment agreement and the RSA as an integrated whole. Petitioners were the key contributors to their distressed debt loan portfolio business before the UMLIC Entities were consolidated into UMLIC S-Corp. The stated purpose of these agreements was to "provid[e] certain financial incentives" to induce petitioners to continue their employment with the consolidated company for an initial term of four years. As a condition of receiving the UMLIC S-Corp. stock, petitioners affirmed that they were "willing to perform future services" on behalf of the company. Section 1 of the employment agreement required each petitioner to "devote all of his efforts to the performance of his duties" for UMLIC S-Corp. for the four-year term of the Agreement and to perform such duties "faithfully, diligently and in a timely manner." These provisions are most naturally read to express the parties' intention that petitioners were required to perform substantial future services for UMLIC S-Corp. in exchange for their stock.

The termination provisions of the employment agreement and the RSA must be evaluated in the light of the parties' expressed intention and the construction of the regulation that we have adopted above. Applying these parameters, and looking only within the four corners of the agreements, we believe that termination for activity specified in section 7(A) of the employment agreement--e.g., for "[d]ishonesty, fraud, embezzlement, alcohol or substance abuse"--is reasonably characterized as a discharge "for cause" within the meaning of section 1.83-3(c)(2). However, we agree with petitioners that termination for activity specified in section 7(B) of the employment agreement does not fall within the scope of discharge "for cause or for committing a crime" for purposes of this regulation.

Section 7(B) permits termination for "[f]ailure or refusal by Employee, after 15 days written notice to Employee, to cure by faithfully and diligently performing the usual and customary duties of his employment." The conditions stated in this section are the conditions that commonly lead employers throughout our economy to terminate at-will employees--namely, unsatisfactory job performance. This is not a "remote" category of event that is unlikely to occur.

More specifically, under the peculiar drafting of these instruments, section 7(B) appears to constitute, in conjunction with RSA section 5(a), a classic "earnout restriction." The employment agreement states that it can be terminated only by

UMLIC S-Corp. and only for reasons denominated "for cause." Given proscriptions against involuntary servitude, there must be some way that petitioners could voluntarily cease working for that company. Section 7(B) seems to be the mechanism that the drafters intended to cover this situation.

If one of petitioners announced his intention to leave his employment before January 1, 2004, section 7(B) contemplates that UMLIC S-Corp. would issue him a "notice to cure." He would then have 15 days to cure "by faithfully and diligently performing the usual and customary duties of his employment and adhere to the provisions of this Agreement." This language tracks section 1 of the employment agreement, wherein each petitioner agreed, during the four-year term of that Agreement, "to perform * * *[his] duties and responsibilities faithfully, diligently and in a timely manner and to abide by all * * * [UMLIC S-Corp.] policies relating to its employees generally." What petitioner would have to "cure," in other words, was his refusal to continue performing the duties specified in the employment agreement, which he had pledged diligently to discharge for four years. If petitioner did not cure this breach within 15 days, UMLIC S-Corp. was entitled under section 7(B) to terminate the employment agreement "for cause."[7]

---

[7]Technically speaking, by acting under section 7(B), UMLIC S-Corp. would not be terminating the employee for cause, but rather would be terminating the

(continued...)

In short, section 7(B) of the employment agreement appears to be the linchpin of the mechanism by which petitioners would receive less than full fair market value upon forfeiture of their stock if they did not continue to perform substantial services for UMLIC S-Corp. for the four-year initial term of that agreement. As a general rule, "[t]he rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." Sec. 83(c)(1). The regulations make clear that an earnout restriction creates "a substantial risk of forfeiture" if there is a sufficient likelihood that the restriction will actually be enforced. Compare sec. 1.83-3(c)(4), Example (1), Income Tax Regs., with sec. 1.83-3(c)(3), Income Tax Regs.

We thus conclude that RSA section 5(a) in conjunction with section 7(B) of the employment agreement--however inartfully drafted--constitutes an earnout restriction that may give rise to a "substantial risk of forfeiture" under section 83. Notwithstanding section 7(B)'s appearance in a contractual provision addressing termination "for cause," the employee activity specified in section 7(B) falls outside the scope of discharge "for cause or for committing a crime" within the

---

[7](...continued)
employment agreement for cause, with "cause" consisting of the employee's breach of that Agreement by refusing to work for the agreed-upon four-year term.

meaning of section 1.83-3(c)(2), Income Tax Regs. That is so because an employee's inability or disinclination to work for the agreed-upon term of his employment contract is not a "remote" event that is unlikely to occur. Even more clearly, that is so because a conclusion that section 1.83-3(c)(2) precludes an earnout restriction from creating a "substantial risk of forfeiture" would make that subparagraph of the regulation inconsistent with the statute. See sec. 83(c)(1); Phillips Petroleum Co. v. Commissioner, 97 T.C. at 35.

## Conclusion

For these reasons, we will deny respondent's motion for partial summary judgment, which is based solely on the theory that section 1.83-3(c)(2), Income Tax Regs., caused petitioners' UMLIC S-Corp. stock to be "substantially vested" at the time it was issued to them. Respondent has advanced a number of other theories, addressed both to the overall structure that petitioners implemented and to the specific question of whether their stock was "substantially vested " upon issuance. For example, as an alternative to his theory based on section 1.83-3(c)(2), respondent contends that petitioners' stock was "substantially vested" on the theory that petitioners' status as the sole directors of UMLIC S-Corp. enabled them to remove at will any ownership restrictions to which their stock was subject, so that the forfeiture conditions were unlikely to be enforced. See sec. 1.83-3(c)(3), Income

Tax Regs. This theory, like respondent's other theories, remains for trial on the merits. Because petitioners' cross-motion seeks summary judgment on one or more of these other IRS theories, which involve material issues of disputed fact, petitioners' cross-motion will be denied.

<u>An appropriate order will</u>

<u>be issued</u>.