# United States Tax Court

T.C. Memo. 2022-3

JOHN M. LARSON,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 15809-11.                          Filed February 2, 2022.

————

*Reed J. Hollander, Carl Wells Hall III, Kevin A. Planegger,* and *Theodore H. Merriam*, for petitioner.

*William F. Castor, Vassiliki E. Farrior,* and *Gerald A. Thorpe*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

JONES, *Judge*: Petitioner, John M. Larson, along with two other individuals, Robert A. Pfaff and David Amir Makov, promoted a fraudulent tax shelter transaction known as Bond Linked Issue Premium Structure (BLIPS). Mr. Larson was convicted of tax evasion for his involvement in BLIPS, but the central issue in this case concerns the use of a restricted stock agreement to defer recognition of income earned from these transactions.

Mr. Larson, Mr. Pfaff, and Mr. Makov organized an S corporation, Morley, Inc. (Morley), and an Employee Stock Option Plan (ESOP). They were the trustees of the Morley ESOP and caused it to be a 5% shareholder of Morley. Simultaneously, they caused Morley to enter into a three-year employment agreement and restricted stock agreement whereby they had to forfeit their Morley stock if they were terminated within that timeframe. All Morley income for the 1999 and

[*2] 2000 taxable years was allocated to the Morley ESOP according to the restricted stock agreements Mr. Larson, Mr. Pfaff, and Mr. Makov signed. Mr. Larson did not report any income related to the BLIPS transactions on his tax returns for 1999 and 2000 on the basis that his Morley stock was not substantially vested for the purposes of section 83.[1]

On September 5, 2000, the Internal Revenue Service (IRS or respondent) issued I.R.S. Notice 2000-44, 2000-2 C.B. 255, which advised that tax shelters such as BLIPS were not bona fide and that penalties might be imposed on the promoters of these transactions. On January 2, 2001, Mr. Larson, Mr. Pfaff, and Mr. Makov voted to terminate the restrictions on the Morley stock. They did not inform the members of the Morley ESOP, allow the Morley ESOP to consent to the removal of the restrictions, or resign as Morley ESOP trustees before voting to remove the restrictions.

In a notice of deficiency dated April 4, 2011, the IRS disallowed deferral of Mr. Larson's distributive share of Morley income, resulting in deficiencies of $6,867,653, $2,431,749, and $1,253,344 for the 1999, 2000, and 2001 tax years, respectively. The first issue for decision is whether respondent erred in determining that Mr. Larson's stock in Morley was not subject to a substantial risk of forfeiture pursuant to section 83 for taxable years 1999 and 2000. We must also decide whether certain expenses incurred and paid by Morley during the 2000 and 2001 taxable years were ordinary and necessary business expenses deductible under section 162. We resolve these issues in respondent's favor.

FINDINGS OF FACT

The parties filed a first stipulation of facts, a first supplemental stipulation of facts, a second supplemental stipulation of facts, and accompanying exhibits which we incorporate by this reference. The parties also filed a stipulation of settled issues which requires computations under Rule 155.[2] Mr. Larson was incarcerated in El Paso,

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulatory references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]In the stipulation of settled issues, the parties agreed that reported interest income on Mr. Larson's 1999 and 2000 returns is reduced by $64,896 and $161,680, respectively.

**[*3]** Texas, at the time he timely filed the petition to commence this case. His residence immediately before his incarceration was in New York City, New York.

I.   *The Presidio and Morley Entities*

During the years at issue Mr. Larson was a licensed certified public accountant (CPA) and a licensed attorney. From around 1986 until August 1997 Mr. Larson was a senior tax manager at the accounting firm KPMG (formerly known as KPMG Peat Marwick) in the international tax group. During his employment at KPMG Mr. Larson was introduced to Mr. Pfaff, a partner in KPMG's Denver, Colorado, office working on international tax matters. Mr. Larson also worked with a KPMG employee named Kerry Bratton, who had been a CPA since 1993.

In August 1997 Mr. Larson and Mr. Pfaff resigned from KPMG and formed Presidio Advisors, LLC (Presidio Advisors). In 1997 Ms. Bratton joined Presidio Advisors as the director of investor relations. In the fall of 1997 Mr. Larson met Mr. Makov, who specialized in foreign currency trading. Mr. Makov graduated from Harvard Business School and held a series 7 National Association of Securities Dealers, Inc. (NASD), registration.[3] Neither Mr. Larson nor Mr. Pfaff held any registration with NASD.

On August 10, 1999, Mr. Larson, Mr. Pfaff, and Mr. Makov caused Morley to form Presidio Advisory Services, LLC (Presidio), as a Delaware limited liability company. On the same day, Mr. Larson incorporated Morley, an S corporation for federal income tax purposes during the years relevant to this case. The certificate of incorporation of Morley authorized the issuance of 3,000 shares of common stock and the bylaws stated that each stockholder shall have one vote for each share of stock. Mr. Larson, Mr. Pfaff, and Mr. Makov were named as Morley's managing directors and president, treasurer, and secretary, respectively. On July 16, 1999, Mr. Larson, Mr. Pfaff, and Mr. Makov formed Presidio Growth, LLC (Presidio Growth). Mr. Larson, Mr. Pfaff,

---

[3]Pursuant to the Financial Industry Regulatory Authority and the North American Securities Administration Association, a series 7 license is the general securities representative license, which allows the licensee to sell almost any type of individual security. *See* Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a–78pp); *Fleischer v. Commissioner*, T.C. Memo. 2016-238, at *3 n.2.

[*4] and Mr. Makov, through Presidio and Presidio Growth, began marketing a tax shelter strategy known as BLIPS.

## II.  *BLIPS*

Each BLIPS investment involved the formation of a Strategic Investment Fund (SIF), of which investors owned about 90% and Presidio Growth owned an interest.  The SIF would obtain a premium loan consisting of a principal amount and a substantial additional premium with an above-market interest rate.  *See Shasta Strategic Inv. Fund, LLC v. United States*, No. C-04-04264, 2014 WL 3852416, at *2 (N.D. Cal. July 31, 2014).  The premium amount of the loan was set to equal the investor's desired tax loss.  *Id.*

Presidio used the SIF's loan proceeds to place a short position speculating that certain foreign currencies would lose value.  For purposes of calculating the investor's outside basis, the investor would treat the obligation to repay the premium portion of the loan as contingent and not as a liability.  All BLIPS investments were designed to close within 60–90 days.  The intended effect of the arrangement, as described in *Keeter v. Commissioner*, T.C. Memo. 2018-191, at *5, was for the investor to claim inflated bases in the distributed assets which in turn generated tax losses upon the sale of the distributed assets.  The district court in *Shasta Strategic Inv. Fund, LLC*, 2014 WL 3852416, at *9, found BLIPS to lack economic substance.

Mr. Larson, Mr. Pfaff, and Mr. Makov sold BLIPS investments to more than 100 investors in 1999 and 2000.

## III.  *The Morley ESOP*

On August 10, 1999, Mr. Larson caused Morley to form an ESOP and a related trust for its employees and contributed 150 shares of common stock to the Morley ESOP.[4]  The Morley ESOP had four trustees:  Mr. Larson, Mr. Pfaff, Mr. Makov, and Ms. Bratton.  In a determination letter issued on May 25, 2000, the IRS recognized the Morley ESOP as a qualified plan under sections 401(a) and 4975(e)(7).  Mr. Larson, as president of Presidio, adopted the Morley ESOP on behalf of Presidio as a "participating employer."  As of December 31, 1999, and December 31, 2000, there were nine participating employees vested in

---

[4]An employee stock ownership plan is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014).

[*5] the Morley ESOP, including Mr. Larson, Mr. Pfaff, and Mr. Makov. Except for Mr. Larson, Mr. Pfaff, and Mr. Makov, these individuals were employed by Presidio, not Morley.

IV.    *The Restricted Stock Agreements*

On August 10, 1999, Mr. Larson, Mr. Pfaff, and Mr. Makov each signed an employment agreement with Morley.   Each employment agreement included a section entitled "restricted stock agreement." This section stated that the respective grantor trusts of Mr. Larson, Mr. Pfaff, and Mr. Makov would receive shares of common stock of Morley and ownership of said stock would be governed by restricted stock agreements, effective August 10, 1999.   Simultaneously with the execution of the employment agreements, Mr. Larson, Mr. Pfaff, and Mr. Makov each signed restricted stock agreements with Morley.

Each restricted stock agreement stated that the shareholder of Morley stock could not assign, transfer, mortgage, pledge, encumber, hypothecate, or otherwise dispose of any of the Morley shares without first obtaining written consent of 100% of the shareholders of Morley. The restricted stock agreement contained provisions, which, taken together, stated that if an employee's employment was terminated with or without cause before August 10, 2002, he was deemed to have offered to sell all of his shares of Morley stock at a purchase price determined by section 5(a) of the agreement.   The agreement was effective until written consent to termination by the holders of 100% of the outstanding shares of voting common stock.  Upon receipt of written notice of consent to termination, Morley had to promptly deliver copies of such written notice to all shareholders.

The stated purpose of these agreements was to incentivize retention of Mr. Makov, who had a history of frequently changing jobs. Mr. Makov requested that Mr. Larson and Mr. Pfaff also sign restricted stock agreements so as not to single him out.   At trial, Mr. Larson testified that when they adopted the restrictions, Mr. Larson, Mr. Pfaff, and Mr. Makov were "in [it] together."  Mr. Larson was aware of the tax planning opportunity in entering into these agreements.

Several Morley ESOP participants were unaware that Mr. Larson was an employee of Morley, rather than Presidio.  These employees were likewise unaware that Morley owned Presidio.   Furthermore, these employees never received a copy of Mr. Larson's restricted stock agreement, were not advised of their rights as participants of the Morley

**[*6]** ESOP, or were unaware that Mr. Larson's stock was subject to forfeiture.

## V.    *Termination of the Restricted Stock Agreements*

On September 5, 2000, the IRS issued Notice 2000-44, which advised that purported losses from tax shelters such as BLIPS were not bona fide and did not reflect actual economic consequences and that penalties might be imposed on the promoters of these transactions. As a result of the issuance of Notice 2000-44, Mr. Larson, Mr. Pfaff, and Mr. Makov began terminating Presidio's employees, ceased all new BLIPS transactions, and wrapped up the deals that were already on the books. Several months after the issuance of Notice 2000-44, Morley developed a new deal structure but performed only a limited number of transactions. Mr. Makov's work slowed considerably as a result of Notice 2000-44, and Mr. Larson believed there was no reason to compel Mr. Makov to stay.

On January 2, 2001, Mr. Larson, Mr. Pfaff, and Mr. Makov released the forfeiture restrictions on their shares of Morley stocks. They did not release the restrictions as trustees of the Morley ESOP, nor did they resign their positions as trustees of the Morley ESOP before terminating their stock restrictions.[5]

Neither the Morley ESOP nor anyone on behalf of the Morley ESOP provided written consent to the termination of the Morley stock forfeiture restrictions. The Presidio employees were unaware that Mr. Larson had released the stock forfeiture restrictions, and they did not vote to release those restrictions. Mr. Larson did not cause the Morley ESOP to retain outside counsel to protect its interest. Upon leaving Presidio, employees received funds from their Morley ESOP accounts via transfers to rollover individual retirement accounts.

The stock forfeiture restrictions were not enforced, but rather, were released by Mr. Larson, Mr. Pfaff, and Mr. Makov during the "earnout" period. Just as they were "in [it] together," Mr. Larson, Mr. Pfaff, and Mr. Makov were going to act "as one, unanimously" when

---

[5]Mr. Larson objects to paragraphs 153 through 157 of the joint stipulation of facts dated January 10, 2020, on the grounds that they are not relevant. These are facts that are of consequence to the determination of the action within the meaning of Rule 401 of the Federal Rules of Evidence. Under these circumstances we conclude that paragraphs 153 through 157 are relevant, and we overrule Mr. Larson's objections to them.

**[\*7]** lifting the restrictions.  Mr. Larson further testified that he did not know he had fiduciary obligations as an ESOP trustee to the Morley ESOP and its participants.  He also testified that he was unaware that fiduciaries should not engage in self-dealing.

VI.  *Forms 1120S, U.S. Income Tax Return for an S Corporation: 1999–2001*

Morley filed Forms 1120S for the 1999, 2000, and 2001 taxable years.  On Forms 1120S Morley reported income and expenses of Presidio because it was a single-member LLC disregarded for Federal income tax purposes.  Reported gross receipts consisted of BLIPS fees paid to Presidio, and reported expenses included the salary expenses of the six Presidio employees.

Schedules K-1, Shareholder's Share of Income, Credits, Deductions, etc., for the Morley ESOP were attached to Morley's 1999 and 2000 returns and reported that the ESOP owned 100% of Morley.  All Morley income for the 1999 and 2000 taxable years was allocated to the Morley ESOP according to the restricted stock agreements Mr. Larson, Mr. Pfaff, and Mr. Makov signed on behalf of their respective grantor trusts.

The parties were unable to stipulate that the amounts deducted as business expenses on Morley's tax returns were incurred.  Mr. Larson believed that the amounts reported would have been incurred and paid.  Mr. Larson also thought that each of the business expenses reported for the 2000 and 2001 taxable years would have been supported by bank statements and underlying records but failed to produce such documentation.

VII.  *Mr. Larson's Forms 1040, U.S. Individual Income Tax Return: 1999–2001*

For purposes of subchapter S, "stock that is issued in connection with the performance of services * * * and that is substantially nonvested * * * is not treated as outstanding stock of the corporation, and the holder of that stock is not treated as a shareholder solely by reason of holding the stock."  Treas. Reg. § 1.1361-1(b)(3).  Mr. Larson did not report any pro rata share of passthrough income from Morley for the 1999 and 2000 taxable years on the basis of his position that his outstanding stock was subject to a substantial risk of forfeiture and therefore was nonvested.

[*8]   On his 2001 return Mr. Larson reported wages and income from Schedule C, Profit or Loss From Business, relating to director's fees paid by Morley.  Mr. Larson reported on Schedule E, Supplemental Income and Loss, passthrough income from Morley for the 2001 taxable year relating to termination of the purported Morley stock restrictions.  Mr. Larson also reported a Schedule E passthrough loss from Morley relating to his pro rata share of Morley's loss claimed on its 2001 return.[6]

VIII.  *Criminal Proceedings and IRS Notice of Deficiency*

In December 2008 Mr. Larson and Mr. Pfaff were convicted by a jury of 12 counts of tax evasion, including evasion with respect to the BLIPS transactions.  In April 2009 Mr. Larson was sentenced to imprisonment of 121 months, three years of supervised release, and a fine.

After examination, the IRS issued a notice of deficiency to Mr. Larson on April 4, 2011.  The IRS determined deficiencies of $6,867,653, $2,431,749, and $1,253,344 for the 1999, 2000, and 2001 tax years, respectively.  The IRS determined that the restrictions on Mr. Larson's Morley stock were not respected by the parties and accordingly disallowed deferral of Mr. Larson's distributive shares of Morley income.  In the alternative respondent disregarded the Morley stock restrictions on the basis that the entire arrangement was entered into primarily to reduce taxes, was a sham, and must be disregarded for income tax purposes.  Accordingly, the IRS increased Mr. Larson's distributive shares of Morley income for 1999, 2000, and 2001 from zero to $8,915,329, $4,265,220, and $2,790,737, respectively (i.e., 33.33% of Morley's reported income for the relevant taxable years).[7]  The IRS also

---

[6]Mr. Larson, through his counsel, filed protective refund claims on Forms 1040X, Amended U.S. Individual Income Tax Return, for taxable years 2002–05. Copies of these documents were collectively attached to the Joint First Stipulation of Facts as Exhibit 144–J.  Respondent objects to this exhibit on the grounds of relevancy to the extent Mr. Larson offered the exhibit as evidence of his tax liabilities for taxable years 2002–05, as those years are not in front of this Court.  As Exhibit 144–J and the protective claims were not discussed at trial, we sustain respondent's objection.

[7]On his 2001 return Mr. Larson reported Schedule E passthrough income from Morley of $8,680,625 on the basis of the termination of the Morley stock restrictions. On his 2001 return, Mr. Larson also reported a Schedule E passthrough loss from Morley of $8,515,404 relating to his pro rata share of Morley's reported loss of $26,887,918.  In the notice of deficiency, respondent did not make a separate negative adjustment of $8,680,625 to reverse petitioner's reported Schedule E passthrough income from Morley of $8,680,625.  Rather, respondent adjusted Mr. Larson's pro rata

**[\*9]** determined that all or parts of Mr. Larson's underpayments of tax for the 1999, 2000, and 2001 tax years were due to fraud.[8]

## OPINION

I. *Burden of Proof*

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). A taxpayer must prove his entitlement to any deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).

II. *Statutory and Regulatory Framework*

A. *S Corporations and ESOPs*

An S corporation is defined as a small business corporation for which an election under section 1362(a) is in effect for the relevant tax year. § 1361(a)(1). Like partnership income, income from an S corporation flows to its shareholders, resulting in only one level of taxation. *See* § 1363(a); *Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 204 (2009) (quoting *Gitlitz v. Commissioner*, 531 U.S. 206, 209 (2001)), *aff'd*, 679 F.3d 1109 (9th Cir. 2012). An S corporation shareholder generally determines his or her tax liability by taking into account a pro rata share of the S corporation's income, losses, deductions, and credits. § 1366(a)(1).

When qualified ESOPs meet the section 401(a) requirements, their related trusts are generally exempt from income taxation pursuant to section 501(a). Effective January 1, 1998, Congress provided that certain tax-exempt entities, including ESOPs, were permitted to be

---

share of Morley income (loss) based on a reported amount of zero when in fact petitioner's return reported his pro rata share of Morley's loss to be $8,515,404. The parties agree that, if respondent prevails on the issue of whether Mr. Larson's Morley stock restrictions should be respected, respondent's adjustment to Mr. Larson's Schedule E passthrough income (loss) from Morley for 2001 should be $2,625,516, rather than $2,790,737 as determined in the notice of deficiency (i.e., respondent would concede $165,221 of the adjustment, as to amount), subject further to the determination by the Court as to respondent's disallowance of Morley entity-level deductions.

[8]At trial respondent conceded the fraud penalty for all years at issue.

**[*10]** shareholders of S corporations.[9] Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1316(a), 110 Stat. 1755, 1785–86. These provisions enacted a framework which allowed all of the outstanding shares of an S corporation to be owned by an ESOP, effectively allowing S corporation profits to escape federal income taxation. *See Austin v. Commissioner* (*Austin II*), T.C. Memo. 2017-69, at *33, *aff'd sub nom. Estate of Kechijian v. Commissioner*, 962 F.3d 800 (4th Cir. 2020). To address concerns about ownership structures involving S corporations and ESOPs, Congress amended the Internal Revenue Code in 2001 to require that income or loss that had previously been allocable to the ESOP be attributable to certain non-ESOP shareholders of a closely held corporation. *See* Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, § 656, 115 Stat. 38, 131–35. But Congress made the change prospectively and did not generally apply it to plan years before 2005 for an ESOP (as in the instant case) that existed before 2001. *See id.* subsec. (d).

Shareholders of an S corporation could use the above framework to defer income if they owned "substantially nonvested" stock because it is considered to be "non-outstanding." *See Austin II*, at *13–14, *32–33; Treas. Reg. § 1.1361-1(b)(3). When shares are "non-outstanding," an S corporation can allocate 100% of its income, losses, deductions, and other tax items to an ESOP. *See Austin II*, at *14, *32–33.

B.    *Substantially Vested Stock*

Section 83(a) governs the tax treatment of property transferred "in connection with performance of services." Upon such a transfer, section 83(a) generally provides that the value of such property is taxable in the first year in which the taxpayer's rights in the property are "transferable or are not subject to a substantial risk of forfeiture." Thus, a taxpayer can defer recognition of income until his rights in the restricted property become "substantially vested." *Austin v. Commissioner* (*Austin I*), 141 T.C. 551, 559 (2013); Treas. Reg. § 1.83-1(a)(1). Shares of stock are subject to a substantial risk of forfeiture if the owner's rights to their full enjoyment are conditioned upon the future performance of substantial services by any individual. *QinetiQ*

---

[9]Such income allocable to an ESOP from an S corporation did not constitute unrelated business taxable income within the meaning of section 512(a)(1). *See* Taxpayer Relief Act of 1997, Pub L. No. 105-34, § 1523, 111 Stat. 788, 1070–71.

[*11] *U.S. Holdings, Inc. & Subs. v. Commissioner*, T.C. Memo. 2015-123, at *24, *aff'd*, 845 F.3d 555 (4th Cir. 2017).

The requirement that an employee render future services as a precondition for obtaining full enjoyment of restricted property is often referred to as an "earnout" restriction. *Austin I*, 141 T.C. at 559–60 (citing *Campbell v. Commissioner*, T.C. Memo. 1990-162, *aff'd in part*, *rev'd in part*, 943 F.2d 815 (8th Cir. 1991)). The regulations provide that "a substantial risk of forfeiture exists only if rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person." Treas. Reg. § 1.83-3(c)(1). Whether a substantial risk of forfeiture exists depends on the facts and circumstances. *Id.*

The regulations provide five factors to consider when determining whether an employee's interest in transferred property is subject to a substantial risk of forfeiture in instances where an employee of a corporation owns a significant amount of stock of the employer corporation:

> (i) the employee's relationship to other stockholders and the extent of their control, potential control and possible loss of control of the corporation, (ii) the position of the employee in the corporation and the extent to which he is subordinate to other employees, (iii) the employee's relationship to the officers and directors of the corporation, (iv) the person or persons who must approve the employee's discharge, and (v) past actions of the employer in enforcing the provisions of the restrictions.

*Id.* subpara. (3).

Thus, in order for section 83 to apply to Mr. Larson's Morley stock for the 1999 and 2000 taxable years, the facts and circumstances must show that it was subject to a substantial risk of forfeiture during that period.

C.     *Substantial Risk of Forfeiture*

In *Austin I*, 141 T.C. at 553, two taxpayers worked together in the distressed debt loan portfolio business. Before 1998 the taxpayers were original shareholders of a group of related companies called "the UMLIC Entities." *Id.* The taxpayers formed an S corporation and, in a section 351 transaction, the taxpayers transferred their interest in the UMLIC

**[\*12]** Entities to the S corporation in exchange for common stock. *Id.* Concurrently, the S corporation issued shares of its common stock in exchange for a note to an ESOP for its employees, including the two taxpayers. *Id.* As part of this exchange, the taxpayers executed employment agreements and restricted stock agreements almost identical to those in the instant case. *See id.* at 554. In particular, the taxpayers would receive less than full fair market value upon forfeiture of their stock if they did not perform substantial services for the S corporation until the expiration of their initial term of agreement. *Id.* at 556. Thus, the employment agreement in conjunction with the restricted stock agreement constituted a classic "earnout restriction." *Id.* at 567.

The Court considered whether there was a sufficient likelihood that the earnout restrictions would be enforced. *Id.* at 568. Finding that an employee's inability or disinclination to work for the agreed-upon term was not a remote event unlikely to occur, the Court held that the relevant earnout restriction could give rise to a substantial risk of forfeiture within the meaning of section 83. *Id.*

In *Austin II*, at \*24, the Court found that the taxpayers credibly testified that they understood their fiduciary obligations to the ESOP. The ESOP had retained outside counsel to protect its interest when called upon to vote on the sale of the S corporation's assets. *Id.* Furthermore, the Court stated,

> [b]ecause approving removal of the forfeiture provision affecting either petitioner's shares would have been directly contrary to the economic interest of the ESOP, it would have been a grotesque conflict of interest for petitioners to have acted as ESOP trustees for such a vote. We are confident that petitioners in such circumstances would have resigned as trustees, as they in fact did in 2003, rather than face the consequences of a self-dealing charge. The ESOP used a pass-through voting system whereby participants voted confidentially through a third party, who directed the trustees to vote in accordance with the participants' majority vote. The participants would thus have been uninhibited in voting their economic interest, which would plainly have dictated a vote against waiver of the forfeiture provision.

*Id.* at \*24–25.

**[\*13]** The Court thus held that the stock held by the taxpayers was subject to a substantial risk of forfeiture and remained subject to that risk until the forfeiture provisions lapsed. *Id.* at \*28–29.

III.  *The Parties' Arguments*

Mr. Larson argues that the Morley stock issued to him on August 10, 1999, was subject to a substantial risk of forfeiture and therefore did not vest until the employment-related restrictions were released on January 2, 2001. Mr. Larson contends that he entered into the restricted stock agreement in conjunction with Mr. Pfaff and Mr. Makov as an incentive to retain Mr. Makov as an employee because he had a history of frequently changing jobs.

Respondent counters that the Morley stock was substantially vested when Mr. Larson received it in 1999 because the forfeiture conditions were unlikely to be enforced. Alternatively, respondent argues that the restrictions lacked economic substance because there was no nontax business purpose for the restricted stock agreements and employment agreements.

IV.  *Analysis*

Mr. Larson failed to demonstrate that the Morley stock was subject to a substantial risk of forfeiture in the 1999 and 2000 taxable years. The facts and circumstances support this conclusion.

Mr. Larson, Mr. Pfaff, and Mr. Makov, through their respective grantor trusts, owned 95% of Morley's common stock, with the Morley ESOP owning the remaining 5%. In situations in which restricted property is transferred to an employee "who owns a significant amount of the total combined voting power or value of all classes of stock of the employer corporation," Treasury Regulation § 1.83-3(c)(3) directs us to consider several factors. The regulation emphasizes the importance not just of stock ownership percentages, but of the de facto power to control. *See Austin II*, at \*21.

Mr. Larson, along with Mr. Pfaff and Mr. Makov, formed Morley and promoted the BLIPS business together. They had a close working relationship and were "in this together." We acknowledge that only Mr. Makov had the necessary registration for securities trading; but after the IRS issued Notice 2000-44, his work slowed to a halt. Rather than allow Mr. Makov to leave and implement the stock restrictions, Mr. Larson and Mr. Pfaff collectively released their restrictions. This lack

**[\*14]** of enforcement aligns with Mr. Larson's testimony that they were going to act "as one, unanimously" when lifting the restrictions. When the arrangement was no longer beneficial, they terminated it. Mr. Larson did not show that there was sufficient likelihood that the earnout restrictions would be enforced. Rather, his relationship to the officers and directors of the corporation and their actions revealed an effort to collectively avoid enforcement of the restrictions. *See* Treas. Reg. § 1.83-3(c)(3).

Furthermore, removal or waiver of the forfeiture provision required the consent of the holders of 100% of the company's shares. As a holder of a 5% interest, Morley had to obtain the consent of the Morley ESOP before lifting the stock forfeiture restrictions. Mr. Larson did not cause it to do so. These facts show that Mr. Larson, along with Mr. Pfaff and Mr. Makov, had complete control over Morley. *See id.* Mr. Larson did not put forward any convincing evidence that he could possibly lose control over the S corporation. *See id.*

Mr. Larson's casual treatment of his fiduciary duties is particularly telling. Under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1104(a)(1) and 1106(b), the plan's trustees were required to refrain from self-dealing in the plan's assets and to "discharge [their] duties . . . with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity . . . would use." A trustee of an ERISA-qualified plan has a fiduciary duty to inform participants and beneficiaries of their rights under the plan as a result of general fiduciary standards of loyalty and care borrowed from the common law. *See* §§ 401(a), 4975(e)(7); *Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571–72 (1985); *Petersen v. Commissioner*, 148 T.C. 463, 475–76 (2017), *aff'd and remanded*, 924 F.3d 1111 (10th Cir. 2019).

Mr. Larson's handling of his fiduciary responsibilities is distinguished from the way in which the taxpayers in *Austin II* handled similar duties. *See Austin II*, at \*24. Despite having been both a CPA and an attorney, Mr. Larson testified that he was unaware of his duties as a fiduciary of the Morley ESOP. We do not find his testimony credible on these points. Further, Mr. Larson did not resign as a Morley ESOP trustee before voting on the stock forfeiture restrictions. Unlike the taxpayers in *Austin II*, Mr. Larson did not retain outside counsel to protect the Morley ESOP's interest when voting to lift the stock forfeiture provisions. *See id.* Although using an ESOP to defer income was a well-known tax planning strategy at the time, Mr. Larson was not

[*15] free to override the basic fiduciary requirements that were fundamental to the documents that he signed. We find Mr. Larson's actions to be a "grotesque conflict of interest." *See id.*

Finally, the record does not show a pattern of open and fair dealing with regard to the Morley ESOP participants. The Morley ESOP participants were woefully ill-informed of their rights and seemed oblivious to the existence of stock forfeiture restrictions. Consequently, it was unsurprising that they were unaware that Mr. Larson had released the restrictions or that they had the right to vote upon such a release. The Morley ESOP participants would have had a strong economic incentive to enforce the forfeiture clauses, but they were not given the opportunity to do so. Mr. Larson's actions with regard to the Morley ESOP participants make it evident that he, Mr. Pfaff, and Mr. Makov had complete control of Morley. *See* Treas. Reg. § 1.83-3(c)(3). Therefore, the facts and circumstances compel the conclusion that the stock forfeiture restrictions were never likely to be enforced.

Accordingly, we hold that the Morley stock was not subject to a substantial risk of forfeiture under section 83, and we sustain respondent's determination on this matter. We therefore need not address respondent's alternative argument that the entire Morley restricted stock strategy was a sham and should be disregarded for income tax purposes.

V.     *Ordinary and Necessary Business Expenses*

As mentioned above, generally the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. at 115. To deduct an expense under section 162, a taxpayer must establish that the amount was an ordinary and necessary expense paid or incurred in carrying on a trade or business. § 162(a); *see also INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84.

Taxpayers bear the burden of substantiating the amount of any claimed deduction by maintaining the records needed to establish entitlement to such a deduction. *See* § 6001; *Hradesky v. Commissioner*, 65 T.C. 87 (1975), *aff'd*, 540 F.2d 821 (5th Cir. 1976). "A taxpayer's self-serving declaration is generally not a sufficient substitute for records." *Fine v. Commissioner*, T.C. Memo. 2013-248, at *4 (citing *Weiss v. Commissioner*, T.C. Memo. 1999-17).

**[\*16]** Mr. Larson failed to present any credible evidence showing that Morley's business expenses in tax years 2000 and 2001 were ordinary and necessary pursuant to section 162. Mr. Larson relies on internal documents he generated purporting to substantiate the expenses; unreliable hearsay; and his own self-serving, uncorroborated testimony. We are not required to accept such testimony, nor do we here. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986). Taxpayers are required to maintain the records needed to establish entitlement to a deduction, and Mr. Larson has not done so. *See* § 6001. Mr. Larson has failed to introduce sufficient and credible evidence, and therefore did not meet his burden of proof on this issue.

When a taxpayer establishes that he has paid a deductible trade or business expense but is unable to adequately substantiate the amount, the Court may estimate the amount and allow a deduction to that extent. *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). To apply the *Cohan* rule, the Court must have a reasonable basis upon which to make an estimate. *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985). Otherwise, an allowance would amount to unguided largesse. *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957). As Mr. Larson failed to properly establish that Morley incurred ordinary and necessary business expenses, application of the *Cohan* rule would be inappropriate.

VI.  *Conclusion*

We hold that respondent did not err in determining that Mr. Larson's stock in Morley was not subject to a substantial risk of forfeiture pursuant to section 83 for taxable years 1999 and 2000. We further sustain respondent's determination to disallow Morley's ordinary and necessary business deductions for taxable years 2000 and 2001.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we deem them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*